NUMBER 13-09-00516-CV

 

COURT OF APPEALS

 

THIRTEENTH DISTRICT
OF TEXAS

 

CORPUS CHRISTI - EDINBURG  

                                                                                                                     


 

MOHICAN OIL & GAS,
LLC,                                                    Appellant,

 

v.

 

SCORPION EXPLORATION
& PRODUCTION, 

INC. AND CHAPCO, INC.,                                                       
 Appellees.

                                                                                                                     
  

 

On appeal from the
319th District Court 

of Nueces County,
Texas.

                                                                                                                     


 

OPINION

 

Before Justices
Rodriguez, Benavides, and Vela 

Opinion by Justice
Rodriguez

 

            This is an appeal from a jury trial on disputes
over an oil and gas drilling contract.  By one issue, appellant Mohican Oil
& Gas, LLC, plaintiff and counter-defendant in the trial court, challenges
as legally and factually insufficient the evidence supporting the jury's award
of damages and attorneys' fees to appellee Chapco, Inc., defendant and
counter-plaintiff in the trial court.  By one issue, cross-appellant Scorpion
Exploration & Production, Inc., defendant and counter-plaintiff in the
trial court, argues that the trial court erred in awarding attorneys' fees to
cross-appellee Mohican and not Scorpion because Scorpion, not Mohican, was the
prevailing party in the contract litigation.  We affirm, in part, reverse and render,
in part, and reverse and remand, in part.

I. 
Background

 

            Mohican is an oil and gas exploration and
development company.  Scorpion is a drilling contracting company, and Chapco is
a well operating company; both are owned and run by Lauro Chapa.  In the fall
of 2006, Mohican and Scorpion entered into a turnkey contract[1]
for the drilling of Olmitos No. 2, a directional oil and gas well[2]
in Webb County, Texas.  Under the contract, Mohican, as operator, agreed to pay
Scorpion, as drilling contractor, a lump sum of $1.158 million to drill the
well.  The parties agreed that Chapco, Chapa's other company, would be the
listed with the Texas Railroad Commission (TRC) as the operator of Olmitos No.
2.  

Drilling commenced on Olmitos No. 2 on
November 21, 2006.  Throughout December 2006, Scorpion encountered several
difficulties in setting the intermediate casing and proceeding to production
depths,[3]
including premature flowing and the wellbore falling in on itself.[4] 
The difficulties were eventually resolved, and the well reached its total depth
on January 15, 2007.  

Mohican paid Scorpion the first half of
the lump sum contract price up front and the second half when the well reached its
total depth.  In February 2007, Scorpion demanded approximately $836,000 from
Mohican in addition to the lump sum contract price, claiming that the contract
converted to daywork basis when the drilling complications began in early
December 2006.[5] 
Mohican refused to pay the additional sum, and Chapco refused to turn over
operatorship of Olmitos No. 2 until Mohican did so.[6]

In March 2007, Mohican filed a petition
for declaratory judgment against Scorpion and Chapco.[7] 
In its petition, Mohican also alleged breach of contract,[8]
fraud, fraud in the inducement, and sought a verified accounting.  Scorpion and
Chapco then filed counterclaims to Mohican's suit.  Scorpion alleged breach of
contract,[9]
fraud, and quantum meruit, in connection with Mohican's refusal to pay the
additional $836,000 and other claimed wrongs under the contract, and requested
judicial foreclosure on its mechanic's lien on Olmitos No. 2 and an assigned
claim Scorpion purchased from a Mohican creditor.  Chapco alleged breach of
contract and quantum meruit, claiming that Mohican refused to pay Chapco for
its services as the TRC-listed operator.

In May 2009, Mohican's claims and
Scorpion and Chapco's counterclaims were tried to a jury.  At trial, the
following facts, relevant to this appeal, were in dispute:  (1) whether the
contract converted from turnkey to daywork when Scorpion encountered certain
problems in the drilling process; (2) whether Mohican was obligated under the
contract to provide Scorpion with a mudlogger[10]
to assist Scorpion in the drilling of the well[11];
(3) whether the absence of a mudlogger caused delays that were attributable to
Mohican and caused Scorpion damages; and (4) whether Chapco performed any
compensable functions as TRC-listed operator.  

At the close of evidence, the trial
court granted Scorpion's motion for directed verdict on all of Mohican's claims
except its claim for declaratory relief.[12] 
Mohican stipulated at trial that it had an oral agreement with Chapco to serve
as the TRC-listed operator for Olmitos No. 2.  There was, therefore, no
liability question submitted to the jury on Chapco's breach of contract
counterclaim; in this regard, the jury was only questioned on the amount of
damages Chapco proved up.  The trial court thus submitted to the jury questions
on:  Mohican's request for declaratory relief[13];
Scorpion's breach of contract[14]
and fraud counterclaims; and the relevant damages at issue.[15] 


In its verdict, the jury answered
"yes" to Mohican's declaratory relief questions.  The jury also found
that Mohican had breached the drilling agreement with Scorpion but that the
breach was not material and that Mohican had not committed fraud against
Scorpion.  In response to the damages questions, the jury awarded $139,120 in
damages to Scorpion and $60,000 in damages to Chapco.  After the jury's
verdict, the attorneys for all parties submitted affidavits to the trial court
attesting to their fees and expenses in litigating the parties' claims and
counterclaims.[16]

In its judgment, the trial court found
that:  (1) Mohican had established its entitlement to declaratory relief[17];
(2) Scorpion had established its breach of contract claim against Mohican and
should be awarded $139,120[18];
and (3) Chapco should be awarded $60,000 for Mohican's breach of their
agreement.[19] 
The trial court then found that Mohican was the prevailing party in its case
against Scorpion and should be awarded attorneys' fees in the amount of
$163,037.87.  The trial court also awarded Chapco attorneys' fees in the amount
of $72,146.89.  Chapco's total award from Mohican, including prejudgment
interest, was calculated to be $138,763.32.  After offsetting Mohican's
attorneys' fees award by the damages it owed to Scorpion, the trial court
concluded that Mohican should recover $8,481.87 from Scorpion.

After the trial court issued its
judgment, Scorpion filed a motion to modify, correct, or reform the judgment,
arguing that the trial court erred in finding that Mohican was the prevailing
party in the litigation.  Mohican also filed a motion to disregard jury
findings, for judgment notwithstanding the verdict, to reform the judgment, or
in the alternative for a partial new trial or remittitur.  In its motion,
Mohican sought, in relevant part, to set aside the judgment in favor of Chapco
or a new trial or remittitur on that claim because of insufficient evidence of
damages.[20] 
The trial court denied both motions.[21] 
This appeal followed.

II. 
Chapco's Damages

 

            By one issue, Mohican argues that there was
legally and factually insufficient evidence that Chapco suffered $60,000 in
damages for "time spent by Chapco as operator of the Olmitos No. 2
well."  Specifically, Mohican argues that the evidence showed that Chapco
performed none of the essential functions of an operator and Chapco therefore
failed to prove it suffered damages.

A. 
Standard of Review

            In determining whether there is legally
sufficient evidence to support the finding under review, we consider evidence
favorable to the finding if a reasonable fact-finder could and disregard
evidence contrary to the finding unless a reasonable fact-finder could not.  City
of Keller v. Wilson, 168 S.W.3d 802, 827 (Tex. 2005).  We may sustain a
legal sufficiency challenge only when (1) the record discloses a complete
absence of evidence of a vital fact; (2) the court is barred by rules of law or
of evidence from giving weight to the only evidence offered to prove a vital
fact; (3) the evidence offered to prove a vital fact is no more than a mere
scintilla; or (4) the evidence establishes conclusively the opposite of a vital
fact.  Id. at 810; King Ranch, Inc. v. Chapman, 118 S.W.3d 742,
751 (Tex. 2003).  When the evidence offered to prove a vital fact is so weak as
to do no more than create a mere surmise or suspicion of its existence, the
evidence is no more than a scintilla and, in legal effect, is no evidence.  Ford
Motor Co. v. Ridgway, 135 S.W.3d 598, 601 (Tex. 2004).  More than a
scintilla of evidence exists if the evidence furnishes some reasonable basis
for differing conclusions by reasonable minds about the existence of a vital
fact.  Rocor Int'l, Inc. v. Nat'l Union Fire Ins. Co., 77 S.W.3d 253,
262 (Tex. 2002).

In reviewing an appellant's factual
sufficiency challenge to an adverse jury finding on which the other party had
the burden of proof, as is the case here, we will consider, weigh, and examine
all of the evidence in the record, both in support of and contrary to the
finding.  Dow Chem. Co. v. Francis, 46 S.W.3d 237, 242 (Tex. 2001).  We
will set aside the trial court's finding only if it is so contrary to the
overwhelming weight of the evidence as to be clearly wrong and manifestly
unjust.  Cain v. Bain, 709 S.W.2d 175, 176 (Tex. 1986).

B. 
The Evidence

            At trial, John Newman, co-owner of and
landman for Mohican, testified that Mohican was the operator on the drilling
contract and Chapco was listed as operator with the TRC.  Newman testified that
Mohican asked Chapco to be listed as the operator with TRC for competitive
reasons; Mohican wished to avoid being publicly associated with the well. 
According to Newman, however, Chapco performed none of the functions of an
operator, which include "permitting," "receiv[ing]
revenues," "pay[ing] royalties," running daily oil and gas
charts and gauging the well, and "administer[ing] the contracts." 
Newman testified that Mohican hired a company "to do the Railroad
Commission permitting."  Newman admitted that, as TRC-listed operator,
Chapco was liable for certain contingencies such as waste and contamination and
that if "there's a problem, [the operator] gets a phone call." 
Finally, Newman testified that the "highest [Mohican has] received"
for acting as operator is $650 a month.

            Chapa testified that he was seeking $65,000
for acting as operator.  He testified that although he did not do any of the
permitting with the TRC or perform any other operator functions, such as
"send[ing] out reports" to working interest owners, "gather[ing]
the revenue," "figur[ing] out who gets what," or "pay[ing
the] taxes," he was "libel [sic] for everything" and "put
[his] neck into it."  As far as the amount of money he was owed, Chapa
testified that $65,000 "sound[ed] fair to [him]."

            Finally, Chapco called Robert Dougherty to
testify as its expert witness on operations.  Dougherty testified as follows
regarding the responsibilities of the operator:

And then as the operator, you're
in charge for the whole group.  You are the one that puts the whole team
together and focuses them in one direction.  You're the one if any problem
comes up, you're the one that they – whoever they are, come to.  Either the
EPA, land owners, offset operators.  Anyone that may be upset or may have a
complaint.

 

. . . .

 

When you sign on as an operator,
you have to fill out a P5 – you give all your information to the State of
Texas.  Even down to your business address, your home address, and your
driver's license.  And everything builds upon there.  All the information that
you submit that has to do with meeting the requirements and laws of the State
of Texas.  Everything that pertains to information as far as surveys, legal
requirements, you have to be responsible for submitting all that.  And
conducting your operations, when you're drilling, under the rules – drilling
and producing under the rules of the Railroad Commission.

 

. . . .

 

When the well blows out, the
first person they go to is the operator.

 

. . . .

 

Okay.  Let's say that the well
blows out and blows a landowner's cow off into space, the landowner is going to
go to the operator of record for recourse to be – so he can be paid back for
that cow.

 

Let's say that the mud goes and
ruins the environment around there, right; kills the fish in a tank or runs
into Nueces Bay and kills all this, the State of Texas comes to the operator. 
And he goes to Austin and picks up a phone and finds out even where that guy
lives and they'll go knock on his door.  So the operator is the one they come
to first and has the ultimate responsibility.

 

Dougherty testified as follows about
compensation for an operator, in general, and for Chapco, in this case:

            Now, when drilling a well, we charge $1,000 a
day while drilling, okay?  That includes my insurance, my staff, and my
experience that I have in the industry and what I've learned through good times
and bad times and – and then once the well is completed and on production, then
we charge $1,000 a month for our services.  Which includes reporting to the
Railroad Commission, making sure that all operations conform to the rules and
regulations of the State of Texas.

 

            . . . . 

 

            From my understanding, it was 58 days of
drilling. . . .  [At] $1,000 a day, [that would be] $58,000. . . .  The base
charge for being listed as the operator, carrying all the exposure is – the
going rate is $1,000 per month. . . .  "Three or four – if it had been six
months, [that would be an additional] $6,000.

 

Dougherty then agreed that "approximately 64 to
$65,000" would be "a reasonable charge by Chapco."

C. 
Discussion

            Mohican argues that Chapa conceded in his
testimony that he performed none of the essential functions of an operator, as
those functions were defined and explained by Dougherty and the other
witnesses.  Mohican also argues that Dougherty's expert testimony is no
evidence of the damages because his testimony was based on the assumption that
Chapa did perform those functions and was therefore baseless and conclusory. 
For these reasons, Mohican argues that Chapco failed to prove it suffered
damages in the amount it was awarded.

            Under the jury charge, Chapco was awarded
$60,000 for "time spent . . . as operator of the Olmitos No. 2
well."  Because Mohican did not object to the charge and does not
challenge it on appeal, we conclude that is the relevant measure of damages for
this issue.  See Osterberg v. Peca, 12 S.W.3d 31, 55 (Tex. 2000) (citing
Tex. R. Civ. P. 272, 274, 278,
279; Larson v. Cook Consultants, Inc., 690 S.W.2d 567, 568 (Tex. 1985); Allen
v. Am. Nat'l Ins. Co., 380 S.W.2d 604, 609 (Tex. 1964)) ("[I]t is the
court's charge, not some other unidentified law, that measures the sufficiency
of the evidence when the opposing party fails to object to the charge."). 
And even presuming that Chapco
performed only the one function to which Chapa testified,[22]
i.e., assuming liability or "put[ting his] neck into it,"[23]
we conclude there was sufficient evidence to support the damages awarded by the
jury.  

In his testimony, Newman admitted that,
because it was listed as operator with the TRC, Chapco was liable for potential
problems such as waste and contamination.  Chapa also testified that he would
be liable for problems such as blowouts and dry holes.  Dougherty testified
that, when there are problems with a well, "the [TRC-listed] operator is
the one they come to first and has the ultimate responsibility." 
Additionally, when questioned by Mohican's counsel regarding the "actual
work" Chapco performed as operator, Dougherty responded, "First of
all, it's the exposure.  [Chapco] was exposed."  Dougherty stated that,
even if all Chapco did was put its "name on a piece of paper,"
"[i]t's a pretty big job."

With regard to the amount of
compensation, we acknowledge that Chapa's statement that $65,000 was
"fair" compensation for being the TRC-listed operator is, alone, not
likely sufficient to support the jury's award.  But the other evidence was more
specific.  Dougherty testified that he charged $1,000 a day while a well was
being drilled and $1,000 a month after the well is completed and producing.[24] 
Newman, Mohican's landman, even provided a dollar amount; he testified that
Mohican has been compensated up to $650 a month to serve as operator.  The
jury, therefore, had a range of rates to consider in making its determination. 
See City of Keller, 168 S.W.3d at 819 (holding that jurors are the sole
judges of credibility and evidentiary weight).  And based on the evidence
presented, the jury could have reasonably:  credited Dougherty's testimony that
there were "58 days of drilling"; awarded Chapco $1,000 for each of
those days; determined that Chapco served as operator for two more months; and
awarded it $1,000 for each of those months, which would total $60,000.  We will
not second-guess the jury's apparent decision to credit Dougherty's testimony
over Newman's.

            In sum, the testimony at trial established
that Chapco assumed significant liability and responsibility by being listed as
the operator of Olmitos No. 2 with the TRC.  The compensation Mohican owed
Chapco for assuming that responsibility was a matter within the jury's sound
discretion, and there was evidence presented at trial that supported the jury's
$60,000 award.  Thus, viewing the evidence in the light most favorable to the
jury's finding, we conclude that there was legally sufficient evidence that
supported the jury's $60,000 award to Chapco for "time spent" as
operator of Olmitos No. 2.  Contrary to Mohican's assertions on appeal, the
evidence did not conclusively establish that Chapco performed no essential functions
of an operator; rather, there was more than a scintilla of evidence—or evidence
from which reasonable jurors could differ in their conclusions—supporting the
amount awarded to Chapco.  See id. at 810, 827; Rocor Int'l,
Inc., 77 S.W.3d at 262.  Moreover, considering both the evidence in support
of and contrary to the finding, we cannot conclude that the amount of the award
was so contrary to the overwhelming weight of the evidence as to be clearly
wrong and manifestly unjust, so the evidence was also factually sufficient.  See
Dow Chem. Co., 46 S.W.3d at 242; Cain, 709 S.W.2d at 176. 
Mohican's sole issue on appeal is overruled.[25]

III. 
Prevailing Party and Attorneys' Fees

 

            By one issue on cross-appeal, Scorpion
challenges the trial court's award of attorneys' fees to Mohican, arguing that
Scorpion, not Mohican, was the prevailing party in the dispute over the
drilling contract because the jury found that Mohican breached the drilling
contract and awarded Scorpion damages.  

The trial court's judgment provides as
follows regarding the prevailing party and attorneys' fees:

It appeared to the Court that
Mohican is the prevailing party in the litigation between it and Scorpion and
is entitled to reasonable and necessary attorneys['] fees and costs under the
drilling contract and the Texas Civil Practice and Remedies Code § 37.009 and §
38.001.  The Court finds that the amount of $163,037.87 is a reasonable and
necessary fee in the trail [sic] of this matter, if the case is appealed and
Mohican is the prevailing party on the appeal, an amount of $22,500.00 [i]s a
reasonable and necessary fee, and in the event a petition of [sic] review is
filed with the Texas Supreme Court, the amount of $22,500.00 is a reasonable
and necessary attorneys['] fee.

 

            The drilling contract provided as follows
regarding attorneys' fees:

If this Contract is placed in
the hands of an attorney for collection of any sums due hereunder, or suit is
brought on same, or sums due hereunder are collected through bankruptcy or
arbitration proceedings, then the prevailing party shall be entitled to recover
reasonable attorney's fees and costs.

 

            "Parties are free to contract for a
fee-recovery standard either looser or stricter" than the fee-recovery
standards provided by statute, and courts are bound by the parties' choice.  Intercont'l
Group P'ship v. KB Home Lone Star L.P., 295 S.W.3d 650, 653 (Tex. 2009); Wayne
v. A.V.A. Vending, Inc., 52 S.W.3d 412, 417 (Tex. App.–Corpus Christi 2001,
pet. denied) (citing One Call Sys., Inc. v. Houston Lighting & Power Co.,
936 S.W.2d 673, 676 (Tex. App.–Houston [14th Dist.] 1996, writ denied)). 
Because the contract at issue here provides for attorneys' fees, the terms of
the contract, not statute, control the outcome of this issue.  See KB Home
Lone Star L.P., 295 S.W.3d at 653; Wayne, 52 S.W.3d at 412.  

            When interpreting a contractual attorneys'
fee provision in which the "prevailing party" term is left undefined,
as is the case here, we are guided by the Texas Supreme Court's opinion in Intercontinental
Group Partnership v. KB Home Lone Star L.P.  See 295 S.W.3d at
653-57.  To begin, "we presume the parties intended the term's ordinary
meaning."  Id. at 653.  In that regard, 

[t]o qualify as a prevailing party, a . . . plaintiff
must obtain at least some relief on the merits of his claim.  The plaintiff
must obtain an enforceable judgment against the defendant from whom fees are
sought, or comparable relief through a consent decree or settlement.  Whatever
relief the plaintiff secures must directly benefit him at the time of the
judgment or settlement.  Otherwise the judgment or settlement cannot be said to
affect the behavior of the defendant toward the plaintiff.

 

Id. at 654 (quoting Farrar v. Hobby,
506 U.S. 103, 111-12 (1992)) (other quotations omitted).  In short,
"[w]hether a party prevails turns on whether the party prevails upon the
court to award it something, either monetary or equitable," and the court
then makes such an award.  Id. at 655.

            Here, in its original petition, Mohican
prevailed upon the trial court to award it the equitable, declaratory relief
related to the drilling contract it eventually obtained in the judgment.  A
complication arises, however, in that the judgment also concludes that Mohican
committed a breach of the same contract against Scorpion.  In light of these
seemingly competing conclusions in the judgment, the question remains:  which
party prevailed in the suit on the contract, Mohican or Scorpion?  Our
conclusion is that this is a case in which there were two prevailing
parties at trial.  

In drawing this conclusion, we are
mindful of the supreme court's reasoning in KB Home with regard to
declarations of rights that 

[V]indication is not always victory.  However satisfying
as a matter of principle, purely technical or de minimis success affords no
actual relief on the merits that would materially alter [the plaintiff]'s
relationship with [the defendant]. . . .  [A] "nominal winner" in
convincing the jury that it was "wronged," cannot be deemed a
"prevailing party" in any non-Pyrrhic sense.  

 

Id. at 656-57 (internal citations and
quotations omitted).  However, the supreme court's reasoning was predicated on
the notion that the plaintiff in such a case sought only actual damages for
breach of contract.  Id. at 656 (stating that "to prevail in a suit
that seeks only actual damages . . . there must be a showing that the plaintiff
was actually harmed, not merely wronged").  In other words, the lawsuit in
the supreme court's scenario was never one to "declare rights";
rather, this suit "always" sought only "money damages."  Id.
at 660-61.

            Here, Mohican filed suit specifically to have
its rights declared under the drilling contract.  It sought equitable,
declaratory relief separate and apart from its breach of contract claim—a claim
that was not only disposed of on directed verdict but was not even related to
the notice and turnkey versus daywork issues in the requested declaratory
relief.  By obtaining that declaratory relief in the trial court's judgment,
Mohican therefore succeeded on the merits of its claim and affected the
relationship between it and Scorpion.  In other words, the declarations
established that Scorpion could not recover from Mohican for any work performed
on a daywork basis, and we conclude that Scorpion thus prevailed in the
controversy over the notice and turnkey versus daywork issue.  The fact that
Scorpion was also awarded damages on its counterclaim does not demote Mohican's
declaratory relief to a mere "nominal," "technical[,] or de
minimis" victory.  To conclude otherwise would exalt monetary damages for
a potentially unrelated counterclaim[26]
over an equitable award that is equally valid in the eyes of the law.  In
Mohican's suit on the drilling contract­—i.e., its request for declaratory
relief—it was awarded the relief it sought from the trial court.  It was a
prevailing party.

            Because we believe that Scorpion's
counterclaim was also a suit on the drilling contract that was governed by the
attorneys' fees provision therein, we further conclude that Scorpion was a
prevailing party because it obtained a favorable answer to its breach of
contract jury question and was awarded damages related to that breach.  For the
same reasons discussed above, we will not weigh the distinguishable successes
achieved by both parties in order to determine that one is prevailing and one
is not.  Although tried before the same jury in the same proceeding, we believe
there were essentially two suits brought on the drilling contract under
different provisions of the contract and based on different actions by the
parties during the drilling.  Mohican prevailed in the controversy over the
turnkey versus daywork issue.  And even though the jury sided with Mohican on
that issue, Scorpion nonetheless proved a breach of contract on its other
pleaded theory for recovery.  To interpret the jury's verdict in any other way
ignores the voluminous evidence and argument at trial regarding the mudlogger
issue.  As such, Scorpion was also a prevailing party in this litigation.

In drawing the foregoing conclusions, we
feel compelled to address the parties' various arguments in support of their
positions that they alone were the prevailing party.  Scorpion argues that its
breach of contract counterclaim rendered Mohican's "non-liability"
declaratory judgment action moot and that Mohican cannot become a prevailing
party by using its declaratory action to avoid the matured breach of contract
claim.  See Shank, Irwin, Conant & Williamson v. Durant, Mankoff,
Davis, Wolens & Francis, 748 S.W.2d 494, 500 n.4 (Tex. App.–Dallas
1988, no writ).  

First, we are not persuaded by the
non-binding dicta holding in Shank, Irwin that Scorpion's contract
counterclaim rendered Mohican's declaratory judgment action moot.  In Shank,
Irwin, the plaintiff filed a suit for declaratory judgment of non-liability
on a contract for fees after the defendant had demanded payment for fees under
that contract.  748 S.W.2d at 496.  The defendant then filed a counterclaim
seeking recovery of those fees it had demanded.  Id.  The trial court
granted summary judgment in favor of the defendant on the counterclaim, but the
court of appeals reversed holding that the plaintiff proved as a matter of law
that it owed no fees under the contract.  Id. at 497, 500.  In a
footnote, the court of appeals then declined to remand the case to the trial
court for a determination of which party prevailed on the declaratory judgment
action and was thus entitled to attorneys' fees, reasoning that once the
defendant filed its counterclaim, the plaintiff's request for declaration of
non-liability became moot.  Id. at 500 n.4.

Here, the parties' claims were tried to
a jury, not disposed of in pre-trial motions.  Even if we were to assume that
Mohican's declaratory action was somehow subsumed into Scorpion's breach of
contract counterclaim, that does not alter the fact that Mohican's declaratory
judgment questions were submitted to the jury without objection by Scorpion.  Further,
Scorpion does not complain on appeal of any inconsistency in the jury's
answers.  We are therefore not persuaded that in this procedurally
distinguishable situation, the pleading of a counterclaim by Scorpion—a
counterclaim that, while arising out of the same contract as Mohican's
declaratory action, is based partly on a different theory of recovery and
different facts—should supplant the jury's clear answers on Mohican's
declaratory action, answers that are challenged by no party on appeal.

            Citing MBM Financial Corp. v. The
Woodlands Operating Co., Scorpion also argues that Mohican's declaratory
judgment action was merely tacked onto Mohican's "matured contract and
tort claims" and, as a result, could not be used as a vehicle to obtain
attorneys' fees where Mohican failed to obtain damages and fees for its breach
of contract action.  See 292 S.W.3d 660, 670 (Tex. 2009).  We disagree
that this is a case in which a breach of contract action was "replead[ed]
. . . as a declaratory judgment" and used as a "vehicle to obtain
otherwise impermissible attorney's fees."  See id. at 669. 
Mohican's original claim was one for declaratory relief.  Although Mohican also
alleged a breach of contract claim in that same petition, it was based on facts
and actions unrelated to the subject-matter of its declaratory judgment action.[27] 
As a result, we do not believe that The Woodlands case governs under the
facts of this case.

In support of Mohican's position that
it, alone, was the prevailing party, Mohican argues that its declaratory
judgment action was the main issue in the litigation and that, because it
obtained favorable jury findings on its requests for declaratory relief,
Mohican was the prevailing party at trial.  In short, Mohican argues that its
declaratory action was the "suit . . . brought on" the contract and
that it prevailed in that suit.  We disagree.

First, the supreme court has implicitly
rejected the sort of "main issue" analysis that Mohican advocates in
cases where a contractual attorneys' fee provision controls.  See KB Home,
295 S.W.3d at 661-62.  Second, concluding that the turnkey versus daywork
controversy was the main issue in the litigation would be ignoring the evidence
that was actually presented and argued at trial.  Having reviewed the entire
trial record, we believe that whether Mohican was obligated to provide a
mudlogger to Scorpion during drilling and whether the delays and complications
in drilling during December 2006 were the result of the failure to provide a
mudlogger were issues of equal importance.  We are therefore unpersuaded by
Mohican's contention that it was the sole prevailing party because the main
issue in the case was its declaratory judgment.

            In sum, we conclude that the trial court
erred in determining that Mohican was the sole prevailing party at trial.  Both
Mohican and Scorpion benefited from the relief awarded to them by the trial
court in the judgment and thus prevailed on the merits of their claims.  See
id. at 654-55.  Because of the unique character of this disposition, we do
not believe that the attorneys' fees affidavits submitted by and stipulated to
by the parties after trial are sufficient for this Court to render awards on
appeal.  Therefore, we will remand the issue of attorneys' fees for
determination by the trial court.  Scorpion's issue is sustained in so far as
it complains that the trial court erred in denying Scorpion prevailing party
status but overruled in so far as it complains that the trial court erred in
ruling Mohican the prevailing party.  

 

IV. 
Conclusion

 

            We affirm the judgment of the trial court
regarding:  (1) the damages awarded to Chapco, and (2) the prevailing party
status conferred upon Mohican.  We reverse the judgment of the trial court in
so far as it denied prevailing party status to Scorpion and render judgment
that Scorpion is a prevailing party in the litigation on the drilling
contract.  We further reverse and remand the case for determination of Mohican
and Scorpion's attorneys' fees in accordance with this opinion.

 

 

                                                                                         NELDA
V. RODRIGUEZ

                                                                                         Justice

 

Delivered
and filed the 27th

day
of January, 2011.









[1]
According to undisputed testimony at trial, a "turnkey" drilling
contract is one in which the drilling contractor assumes all control and
responsibility for drilling the well to a set depth.  Under a turnkey contract,
the drilling contractor is paid a lump sum that typically includes a profitable
premium; the contractor is then responsible for coordinating with the
subcontractors and other entities involved in the drilling and compensating
those entities.  In contrast, when a contract is performed on a "daywork"
basis, the contract operator directs and coordinates all operations on the well
and is therefore responsible for all costs and occurrences associated with
drilling the well to the set depth.





[2]
Testimony at trial established that a directional well is one that deviates the
wellbore—i.e., the drilled hole—along a planned path to a target located a preset
lateral distance and direction from the vertical.  See also Schlumberger
Oilfield Glossary: Directional Well, http://www.glossary.oilfield.slb.com (last
visited Dec. 29, 2010) (defining a directional well as "[a] wellbore that
requires the use of special tools or techniques to ensure that the wellbore
path hits a particular subsurface target, typically located away from (as
opposed to directly under) the surface location of the well").





[3]
According to testimony at trial, casing is heavy pipe used to seal off drilling
fluids from the wellbore and/or to keep a cave-in from occurring in the
wellbore.  The Olmitos No. 2 was to be drilled with three stages of casing: 
surface, intermediate, and production.  First, the surface casing would be put
in place; the surface casing conducts the drilling mud or fluid through the
loose formation or soil near the surface of the well.  Next, the intermediate
casing would be set below the surface casing.  The intermediate casing protects
the formation at that depth and serves as the jump-off to the directional part
of the well and production casing.  The production casing then conducts the
produced hydrocarbons to the surface.





[4]
At trial, the parties disputed the cause of the premature flowing of the well. 
Mohican contended that Scorpion failed to use the proper mud weight to keep the
pressure balanced in the well.  Scorpion contended that Mohican's failure to
provide certain services under the contract left Scorpion without the necessary
information to monitor the well, and the flowing and resulting delay was caused
by unanticipated problems in the formation.  See infra note 10 and accompanying text discussing mudloggers.





[5]
Scorpion claimed that Mohican altered the turnkey contract by changing the
intermediate casing depth after drilling had already begun.





[6]
Mohican obtained an administrative transfer of operatorship from the Texas
Railroad Commission in July 2007.





[7]
Mohican sought declarations from the trial court as follows:

a)         Declare that the drilling
of [Olmitos No. 2] was under the terms of a Turnkey contract;

b)         Declare that under the
Contract, [Scorpion was] required to notify [Mohican] in writing of any change
from Turnkey to daywork and/or vice versa;

c)         Declare that [Scorpion]
did not notify [Mohican] in writing of any change from Turnkey to daywork
and/or vice versa;

d)         Declare that [Scorpion
is] responsible for payment to vendors and service companies it hired to
provide materials, goods or services at the well site;

e)         Declare that [Scorpion is]
not owed any amount under a daywork rate; and

f)          Declare that [Scorpion
is] responsible for removing any liens placed on the lease by vendors and/or
service providers and other subcontractors for non-payment of services.





[8]
Mohican alleged that Scorpion breached the contract by "failing to provide
good and workmanlike equipment, including a triplex mud pump, for the drilling
of the well which caused numerous delays."





[9]
Scorpion alleged that Mohican breached the drilling contract by failing to
provide a mudlogger or, alternatively, by failing to pay the amount due on the
contract as a result of the contract converting from turnkey to daywork.  See
infra note 10 and accompanying text discussing mudloggers.





[10]
According to testimony at trial, when drilling a well, the contractor uses a
circulating system of mud, or drilling fluid, to facilitate the movement of the
drill bit through the earth and regulate the pressure in the hole.  At trial,
testimony established that a mudlogger is a person or entity that samples and
analyzes cuttings from the well's mud system to help determine the nature of
the layer where the well is at any certain point, i.e., whether the well is in
sand or shale and whether there are hydrocarbons present in that layer.

At trial, the parties disputed the exact benefit and
function of a mudlogger.  Mohican contended that mudloggers are mainly useful
to company geologists when the composition of the formation under the drilling
site is uncertain; Mohican posited that the area in which Olmitos No. 2 was
drilled was well-documented and that its geologist therefore did not need a
mudlogger.  Scorpion contended that mudloggers are also useful to the drilling
contractor because a mudlogger's analysis of the cuttings aids the contractor in
determining whether they are drilling into a layer that requires certain
additional precautions in its operations.





[11]
It was established at trial that the drilling contract for Olmitos No. 2
mirrored the contract for an earlier well (Olmitos No. 1) drilled by Scorpion
for Mohican in the same vicinity.  Under both contracts, Mohican agreed to
provide a mudlogger when the well reached a depth of 5,500 feet.  It is
undisputed that Mohican provided a mudlogger during the drilling of Olmitos No.
1 but not during the drilling of Olmitos No. 2.





[12]
Mohican does not challenge the directed verdict on appeal.





[13]
The three declaratory relief questions submitted to the jury were as follows: 
(1) "Did Scorpion and Mohican agree that Scorpion would provide written
notification to Mohican of any change from Turnkey to Daywork?"; (2)
"Did Scorpion fail to comply with the contractual agreement to provide
written notification to Mohican of a change from Turnkey to Daywork?"; and
(3) "Is there a requirement under the contract on Olmitos No. 2 to provide
written notification of a change from Turnkey to Daywork before recovering for
work performed on a Daywork basis?"





[14]
The breach of contract question to the jury was as follows:  "Did Mohican
fail to comply with the drilling contract?"





[15]
With regard to the damages associated with Scorpion's breach of contract action
against Mohican, the jury was asked:  

What sum of money, if any, if paid now
in cash would fairly and reasonably compensate Scorpion for its damages, if
any, that resulted from [Mohican's] failure to comply?  

Consider the following elements
of damages, if any, and none other[:]

The additional time and expenses
incurred by Scorpion as a result of any delays attributable to Mohican's breach
of contract.

With regard to the damages
associated with Chapco's contract action against Mohican, the jury was asked:

What sum of money, if any, if paid now
in cash, would fairly and reasonably compensate Chapco for its damages, if any,
that resulted from such failure to comply?

Consider the following elements of
damages, if any, and none other[:]

. . . .

The time spent by Chapco as operator of
the Olmitos No. 2 well.





[16]
The parties agreed that the issue of attorneys' fees would not be submitted to
the jury, instead agreeing that they would file affidavits of their fees and
expenses with the court after trial.  No objections were made to the fees
affidavits, and they are not challenged on appeal.





[17]
Specifically, the trial court found that Mohican had "established under
its Declaratory Judgment Action the following:"

(A)        That
Scorpion agreed to provide written notification to Mohican of any change from
Turnkey to Daywork basis;

(B)        That
Scorpion failed to comply with the contractual agreement to provide written
notification to Mohican of any change of Turnkey to Daywork basis; and

(C)        That
Scorpion was required under the contractual agreement to provide written
notification of a change from Turnkey to Daywork basis before recovering from
[Mohican] for work performed on a Daywork basis.





[18]
The judgment also awarded Scorpion $15,436 in prejudgment interest.





[19]
The judgment also awarded Chapco $6,657.53 in prejudgment interest.





[20]
In its post-judgment motion, Mohican also asked the trial court to:  disregard
the jury's findings on Scorpion's breach of contract claim because the evidence
did not support the charge and the jury's affirmative answers on Mohican's
declaratory relief precluded recovery by Scorpion on breach of contract; or in
the alternative, order a new trial because the evidence was insufficient to
support the judgment in favor of Scorpion.  On appeal, however, Mohican does
not challenge the jury's findings in favor of Scorpion.





[21]
On appeal, neither party challenges the trial court's ruling on its post-trial
motions.





[22]
We note that there was testimony that Chapa reviewed the daily drilling reports
for the Olmitos No. 2.  Mohican contends that Chapa was reviewing those reports
in his function with Scorpion as the drilling contractor.  Chapco responds that
this distinction is immaterial and that this testimony proves Chapa did perform
some of the duties of operator.  We need not resolve this dispute, however,
because our analysis depends solely on the fact that Chapco performed one
particular operator function—assuming liability and responsibility in the eyes
of the TRC.





[23]
Mohican contends that under the drilling contract, Scorpion was liable for the
first $1 million for damages from blowouts, contamination, and pollution, and
Mohican was liable for any amount in excess of that.  Under the drilling
contract, Scorpion also released and indemnified Mohican from third-party
claims.  As a result, Mohican argues that, contrary to Chapa and Dougherty's
assertions at trial, Chapco was not in fact liable or responsible for blowouts
or other similar incidents should they have occurred on Olmitos No. 2. 
However, we disagree that Scorpion's contractual liability vitiates the
regulatory liability assumed by Chapco by being listed as operator with the
TRC.  In this respect, we find the following testimony by Dougherty compelling:

[Counsel for
Chapco]:   Okay.  Now there's been testimony in this case by Mohican that
Chapco never did anything.  In other words, as an operator; they were only
listed as an operator.  All right?  Just trust me on that.  All right.  My
question to you, though, is regardless of the fact whether they did anything in
terms of looking at that report or that document, who does the Railroad
Commission consider to be the operator and responsible for that well.

[Dougherty]:                  Chapco, Incorporated.

                                    . . . .

[Dougherty]:                  Well,
I'm confused.  Why would [Chapco] be operator of record [if it was not
performing any of the functions]?

[Counsel for
Mohican]:  Because apparently Mohican didn't want some competitors to know that
they were drilling some offset wells.  And so as a favor, Mr. Chapa said,
"I don't mind putting my name on there."

[Dougherty]:                  People
in this business don't – that's like saying, "As a favor I will raise your
child."  Okay?

                                    . . . .

[Counsel for
Mohican]:  Mr. Chapa, all he did – do you understand, Mr. Dougherty, all he did
is he's got his name on a piece of paper and he assumed responsibility?

[Dougherty]:                  Were you there?

[Counsel for
Mohican]:  He just testified to that, okay?  Assume for me that's what he
testified to, "That's all I did.  I put my name on a piece of paper and I
assumed the responsibility."  That's all he did.

[Dougherty]:                  It's a pretty big job.

We are therefore unpersuaded by
Mohican's argument that its and Scorpion's contractual liability bears on the
remaining liability of Chapco established at trial.

 





[24]
On appeal, Mohican challenges Dougherty's expert testimony, contending that his
opinions are no evidence because they are based on the erroneous assumption
that Chapco performed all of the operator functions Dougherty enumerated in his
testimony.  See City of San Antonio v. Pollock, 284 S.W.3d 809, 816
(Tex. 2009).  We disagree that the dollar amounts to which Dougherty testified
are based solely on those functions that Chapco did not perform.  Rather, we
think Dougherty clearly established in his testimony that the assumption of
risk and liability is a key function of an operator, and Dougherty's criteria
for his compensation amounts included "carrying all the exposure." 
Because that is the function on which we base our analysis here, we will not
disregard this evidence.





[25]
In the event we reversed the jury's award to Chapco, Mohican also asked the
Court to modify or eliminate the attorneys' fees awarded to Chapco.  Because we
have affirmed the jury's damages to Chapco, however, we do not reach Mohican's
arguments regarding attorneys' fees.  See Tex. R. App. P. 47.1.





[26]
The question submitted to the jury on Scorpion's counterclaim did not
distinguish between the two unrelated theories for breach of contract advanced
by Scorpion, one of which dealt with the turnkey versus daywork issue and the
other of which dealt with the mudlogger issue.  Neither were the questions
submitted to the jury on Mohican's request for declaratory relief conditioned
on an affirmative or negative answer to the breach of contract question or vice
versa.  By returning affirmative answers on Mohican's declaratory relief questions,
we believe the jury resolved the turnkey versus daywork issue in Mohican's
favor.





[27]
See supra note 8.